[Cite as *State v. Dilley*, 2012-Ohio-5288.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98098**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## WILLIAM DILLEY

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-558185

**BEFORE:** Keough, J., Blackmon, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** November 15, 2012

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, OH 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
James A. Gutierrez
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, William Dilley, appeals from the trial court's judgment, rendered after a bench trial, finding him guilty of tampering with records, perjury, and attempted theft, and sentencing him to two years incarceration. He contends that his convictions were not supported by sufficient evidence and against the manifest weight of the evidence, and that the matter should be remanded for de novo resentencing because the trial court failed to properly sentence him to postrelease control. Finding no merit to the appeal, we affirm.

## Background

{¶2} In January 2012, Dilley was charged with one count each of tampering with records, in violation of R.C. 2913.42(A)(2); perjury, in violation of R.C. 2921.11(A); attempted theft, in violation of R.C. 2923.02/2913.02(A)(2); and theft, in violation of R.C. 2913.02(A)(2).

{¶3} The state's evidence at trial demonstrated the following. Until early 2009, when his employment was terminated, Dilley was a financial advisor for Smith Barney in its Pepper Pike office. As a financial advisor, Dilley counseled clients about their investments and procured investments for them. In 2008, one of his clients was Betty Montgomery, a 92-year-old woman who resided in the assisted living area of Stratford Commons, a nursing home.

{¶4}  Dilley had managed Montgomery's investments since 1995, when she executed a will and a trust.  The will contained pour-over provisions leaving all of her assets and possessions to the trust.  The trust provided that three named individuals were to receive monetary distributions ranging from $1,000 to $3,000 upon her death, and the remainder of the trust assets were to be divided and distributed evenly to two charitable organizations: one-half to Holy Family Cancer Home and one-half to Save-A-Pet.

{¶5}  In 2003, Montgomery, who had no children or known heirs, was admitted to the Stratford Commons assisted living facility.  At trial, Dr. Marwan Hilal, a staff physician at Stratford Commons who cared for Montgomery from 2003 until her death in 2009, reviewed notes from nursing staff, monthly summaries of her condition, and medication and treatment forms.  Notations on the documents indicated that in 2003, Montgomery suffered from "anxiety and depression."  In 2004, she "required moderate assistance in financial decisions" and was "more forgetful and slightly disoriented."  The notes indicated that by September 2005, Montgomery "seem[ed] forgetful and slightly disoriented" and required "maximum assistance in financial decisions."

{¶6}  Dr. Hilal testified that in January 2007, the nursing notes indicated that Montgomery had "dementia and [a] change in mental status" and in December 2007, was "confused and forgetful."  The nursing notes for each of January, February, March, and April 2008 also indicated that Montgomery was "confused."  On June 30, 2008, Dr. Hilal examined Montgomery and noted that she suffered from "moderate to severe dementia."  According to Dr. Hilal, the ability to make sound judgments, especially those regarding

financial decisions, is impaired even in the early stages of dementia. He testified further that Montgomery's condition worsened from 2006 to 2008, and she would not have had the mental capacity in 2008 to make an informed decision about transferring the assets of her estate.

{¶7} This conclusion was consistent with the testimony of Frances Koleszar, who testified that she had been good friends with Montgomery since 1964. Koleszar testified that she and her husband visited Montgomery at Stratford Commons several times a year, but by 2007, Montgomery had difficulty remembering who they were. Koleszar stated that in December 2007, when she and her husband stopped in to visit Montgomery, she was unable to recognize them at all and repeatedly asked them who they were.

{¶8} Dr. Hilal's conclusion about Montgomery's mental capacity was also consistent with the testimony of licensed practical nurses who worked at Stratford Commons and interacted with Montgomery. Veronica Kennedy-Williams testified that she cared for Montgomery daily from 2006 to 2008 and observed her mental condition progressively worsen. Jose A. Giener testified that he had regular contact with Montgomery from 2006 to 2008 and observed that she declined physically and mentally during that time. Barbara Hooten, who cared for Montgomery at least twice a week, testified that Montgomery was confused and unable to comprehend where she was, the current season, or the current calendar year.

{¶9} According to Hooten, a man who had been talking to Montgomery and Montgomery's friend John (who also lived at Stratford Commons) approached her one

day at the nurses' station and asked her to sign some documents. Upon realizing that the documents related to financial matters, Hooten spoke to Tricia Wollschleger, a social worker at Stratford Commons, and asked her to handle the situation because "it didn't seem right."

{¶10} Wollschleger testified that she went to the lobby, where she saw Dilley, Montgomery, John, and an unidentified woman sitting on a couch. When Tricia introduced herself and asked if she could help, the unidentified woman stood up, said something that made Wollschleger realize she was a notary public, and walked out the door.

{¶11} On April 15, 2008, Dilley returned to Stratford Commons with a different notary who witnessed Montgomery sign an amended trust that made Dilley the sole beneficiary of the trust. Debra Benjamin, the notary, testified that she had never met Dilley before he called her and asked her to meet him at Stratford Commons. Dilley met Benjamin in the lobby when she arrived, and they went to Montgomery's room, where Dilley chatted with Montgomery for about 15 minutes. They then went to the lobby area and sat at a table. Benjamin testified that Dilley got out papers, and told her that he had taken care of Montgomery's finances for many years, and was going to be the executor of Montgomery's will. Dilley never told Benjamin that he was going to be the sole beneficiary of the amended trust.

{¶12} Benjamin testified that Dilley showed her Montgomery's birth certificate, and she confirmed with several Stratford Commons employees who walked up to the

table that the woman at the table was indeed Betty Montgomery. According to Benjamin, one staff member witnessed Montgomery's signature on the documents, but the other staff members left before she signed anything. Benjamin stated that no Stratford Commons administrators were ever at the table overseeing the transaction.

{¶13} Kennedy-Williams, the nurse who witnessed Montgomery's signature, stated that there were no administrators from Stratford Commons either at or standing around the table when Montgomery signed the amended trust. She testified further that Dilley said that he was going to be taking care of Montgomery's finances but never told her that he would be a beneficiary of the trust.

{¶14} Jon Lawrence, Dilley's boss at Smith Barney, testified that Smith Barney's written policies regarding bequests to its financial advisors by clients other than family members forbid any bequest under circumstances that create the appearance of a conflict, and provide that special caution regarding such bequests be exercised when the client is elderly or the client's judgment may be impaired. Smith Barney's policies further require that the financial advisor make management aware of such a bequest as soon as the bequest becomes known to the advisor. Lawrence testified that these policies, which only reiterate industry standards, were distributed in writing to Smith Barney's financial advisors in 2007, and Dilley was aware of the policies.

{¶15} Montgomery passed away in January 2009. The value of the amended trust upon her death was approximately $750,000.

{¶16} Lawrence testified that in March 2009, after Dilley presented the amended trust to Smith Barney for approval, he reviewed the 1995 trust and the 2008 amended trust with Smith Barney's legal department. The two documents were identical, except that the beneficiaries under the original trust had been deleted, and Dilley was now listed as the sole beneficiary of the amended trust. Lawrence met with Dilley, who denied that he knew of the beneficiary change prior to Montgomery's death. He also denied that he knew the notary who signed the amended trust or who created the amended trust document. After further investigation, Smith Barney terminated Dilley's employment. Beth Michael, a risk officer at Smith Barney, testified that after his termination, she found the 2008 amended trust document in Dilley's computer files.

{¶17} Subsequently, Smith Barney initiated an interpleader action regarding the validity of the amended trust. David M. Gareau, the attorney for Holy Family Cancer Home, testified that when he deposed Dilley for the interpleader action, Dilley admitted that he had "cut and pasted" documents on his computer to created the amended trust. To save litigation costs, Holy Family Cancer Home and Save-A-Pet eventually settled the interpleader action. As a result of the settlement, Dilley received $75,000 and remained as trustee of the amended trust; the remaining assets were divided evenly between Holy Family Cancer Home and Save-A-Pet.

{¶18} At the close of the state's case, the trial court granted Dilley's Crim.R. 29 motion for acquittal as to Count 4, theft, and denied the motion with respect to the other counts. Dilley did not testify, and the trial court subsequently found him guilty of

tampering with records, perjury, and attempted theft. The court sentenced him to two years on each count, to be served concurrently.

Analysis

A.      Sufficiency and Manifest Weight of the Evidence

{¶19} In his first and second assignments of error, Dilley contends that his convictions were not supported by sufficient evidence and against the manifest weight of the evidence.

{¶20} The test for sufficiency requires a determination of whether the prosecution met its burden of prodution at trial. *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilty beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonble doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶21} A manifest weight challenge, on the other hand, questions whether the prosecution mets it burden of persuasion. *State v. Ponce*, 8th Dist. No. 91329, 2010-Ohio-1741, ¶ 17, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). A reviewing court may reverse the judgment of conviction if it appears that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered." *Thompkins* at 387. A finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *Id.* at 388.

{¶22} Dilley was convicted of attempted theft under R.C. 2913.02(A)(2), which provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * (2) beyond the scope of the express or implied consent of the owner or person authorized to give consent."[1]

{¶23} He was also convicted of tampering with records under R.C. 2913.42, which provides that

> [n]o person, knowing the person has no privilege to do so, and with purpose to defraud * * * shall (1) falsify * * * any writing, computer softward, data, or record; (2) utter any writing or record, knowing it to have been tampered with as provided in division (A)(1) of this section.

{¶24} Dilley contends that his convictions were not supported by sufficient evidence and against the manifest weight of the evidence because the state failed to prove that Montgomery suffered from dementia and was not capable of making an informed decision about her finances. He argues that no one ever gave Montgomery a cognitive test that indicated she was unable to make reasonable decisions, she was never declared incompetent by a court, and was never placed in the dementia ward at Stratford

---

[1]Under R.C. 2923.02(A), "[n]o person, purposely or knowingly, * * * shall engage in conduct that, if successful, would constitute or result in the offense."

Commons.   Accordingly, he contends there was no evidence that Montgomery could not competently decide to give her estate to him.

{¶25} Further, he contends that even if Montgomery suffered from dementia, there was no evidence he knew about the dementia and knowingly took advantage of it.   He asserts that Montgomery signed the amended trust in the lobby of Stratford Commons, a public place, and there were many people around who knew that she was signing documents but did not stop her, including her friend John and a staff member from Stratford Commons who witnessed her signature.   Dilley further contends that it is apparent he did not defraud Montgomery because the amended trust was never invalidated, and he received $75,000 as settlement in the interpleader action and is still the trustee of the amended trust.   Dilley's arguments are without merit.

{¶26} The evidence at trial regarding Montgomery's deficient mental faculties and Dilley's knowledge of her condition was overwhelming.   Four staff members from Stratford Commons testified that Montgomery's mental faculties declined steadily from her admission to the facility until her death in 2009.   Dr. Hilal, Montgomery's personal physician at Stratford Commons, testified that Montgomery had moderate to severe dementia and would not have had the mental capacity in 2008 to make an informed decision about transferring the assets of her estate.   Frances Koleszar, Montgomery's friend for more than 40 years, testified that she noticed obvious changes in Montgomery's demeanor and ability to carry on a conversation, and that by December 2007, Montgomery did not even know who she was.   Montgomery's medical records from

those years noted that she was confused and required "maximum assistance" when making decisions and dealing with financial matters. And significantly, in his deposition in the interpleader action, which was admitted into evidence, Dilley testified that he had managed Montgomery's assets for years, saw her regularly, and was aware of her declining mental state.

{¶27} This evidence, combined with (1) Dilley's false statement to Benjamin, the notary who witnessed Montgomery's signature, that the changes would make him the executor of Montgomery's will, (2) his failure to disclose to Smith Barney in April 2008 that he was now the sole beneficiary of Montgomery's trust, and (3) his subsequent attempts to deny any knowledge about the transaction, unequivocally demonstrates that Dilley knew of Montgomery's diminished mental capacity and took advantage of her condition for his own financial gain.

{¶28} Dilley's argument that his receipt of $75,000 in the interpleader action and the continuing validity of the trust demonstrate he did nothing wrong is not persuasive. Both David Gareau, counsel for Holy Family Cancer Center, and Save-A-Pet founder Arthur Kaplansky, testified that the charities settled with Dilley to avoid the cost of litigation and to gain access to the funds, and that the settlement was not a concession that Dilley had done nothing wrong. They testified further that although the charities conceded that Dilley could remain as trustee, the agreement had no significance because all trust funds were disbursed as a result of the settlement; thus Dilley is a trustee of a trust with no assets.

{¶29} The state offered extensive evidence in this case that with knowledge of Montgomery's diminished mental capacity, Dilley took valid will and trust documents, altered them on his work computer to make himself the sole beneficiary of the trust, and had Montgomery sign them. Further, the parties stipulated that Dilley then filed the amended trust documents with the probate court on April 24, 2008. In light of this evidence, the trial court did not lose its way or create a miscarriage of justice in finding Dilley guilty of attempted theft and tampering with records.

{¶30} Dilley's conviction for perjury was also not against the manifest weight of the evidence. Under R.C. 2921.11(A), which prohibits perjury, "[n]o person, in any official proceeding, shall knowingly make a false statement under oath or affirmation * * * when [the] statement was material."

{¶31} The transcript of Dilley's deposition from the interpleader action, which was admitted into evidence, demonstrated that on four separate occasions, Dilley testified that two supervisors or administrators from Stratford Commons witnessed Montgomery's signature on the amended trust document. Appellant characterized these people as "the top people that ran the nursing home."

{¶32} Dilley's statements were material because of the possible inferences to be drawn from the administrators' presence or absence: the administrators' presence at the signing would support an inference that Stratford Commons had no concern regarding Montgomery's competence, whereas the administrators' absence supports an inference

that Dilley knew that Stratford Commons would not have allowed Montgomery to change her trust to make Dilley the sole beneficiary.

**{¶33}** Dilley's deposition testimony, however, directly contradicted the trial testimony of nurse Kennedy-Williams and notary Benjamin. Both Kennedy-Williams and Benjamin testified that there were no administrators from Stratford Commons either at or standing around the table when Montgomery signed the amended trust documents.

**{¶34}** The weight of the evidence and the credibility of the witnesses are matters primarily for the trier of fact to assess. *State v. Bradley*, 8th Dist. No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). In light of Kennedy-Williams's and Benjamin's testimony contradicting Dilley's deposition testmony, the trial court did not lose its way in finding that Dilley knew his testimony was false when given and hence, was guilty of perjury.

**{¶35}** The first and second assignments of error are therefore overruled. B.
  Postrelease Control

**{¶36}** At sentencing, the trial court advised Dilley that his sentence was subject to "three years mandatory postrelease control following the completion of your prison sentence."

**{¶37}** In his third assignment of error, Dilley contends that the matter must be remanded for a de novo resentencing because the trial court failed to properly impose postrelease control. Specifically, he contends that the trial court improperly told him that postrelease control was mandatory, when in fact, for third degree felonies that are not

felony sex offenses and do not involve physical harm to the victim (such as involved here), postrelease control is discretionary with the parole board.

{¶38} In *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, the Ohio Supreme Court held that where postrelease control was erroneously imposed, resentencing is limited to the proper imposition of postrelease control. *Id.* The defendant is not entitled to be resentenced on the entire sentence; only the portion that is void may be vacated and otherwise amended. *State v. Gregley*, 8th Dist. No. 97469, 2012-Ohio-3450.

{¶39} In this case, the trial court admittedly erred in telling Dilley that postrelease control was mandatory. The journal entry of sentencing, however, correctly stated that postrelease control was discretionary. Furthermore, defense counsel informed the court at oral argument that in September 2012, the trial court granted Dilley's motion for judicial release and reduced his prison term to two years of community control sanctions under the control of the probation department. Thus, Dilley is no longer in prison.

{¶40} Under these circumstances, we hold that any error in the imposition of postrelease control was harmless. Because the journal entry of sentencing was correct, Dilley was never actually subject to three years mandatory postrelease control, even though the trial court so advised him. Furthermore, Dilley is out of prison and subject to up to three years postrelease control only if he violates the community control sanctions, and the court imposes the remainder of the original prison sentence. Accordingly, the third assignment of error is overruled.

**{¶41}** Affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

PATRICIA ANN BLACKMON, A.J., and
MELODY J. STEWART, J., CONCUR